**LEAVE TO FILE AMENDED COMPLAINT GRANTED BY THE COURT ON 5/29/19**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION:  1:18-CV-30120

| | |
|---|---|
| T.H. Glennon Company, Inc. | ) |
| Plaintiff, | ) |
| v. | ) |
| Shonn Monday, | ) |
| Individually, and, | ) |
| As Manager of TMG Green, LLC | ) |
| Defendants | ) |
| -and- | ) |
| Debra Monday, | ) |
| Individually, and, | ) |
| As Manager of TMG Green LLC, | ) |
| Defendants | ) |
| -and- | ) |
| TMG Green, LLC, | ) |
| Defendant | ) |
| -and- | ) |
| Ulderic Boisvert | ) |
| Individually, and as Manager of | ) |
| Greenwood Farms, LLC | ) |
| Defendants | ) |
| -and- | ) |
| Greenwood Farms, LLC | ) |
| Defendant | ) |
| -and- | ) |
| Ulderic Boisvert | ) |
| Individually, and as President of | ) |
| H.U.R.B. Landscaping, Inc. | ) |
| Defendants | ) |
| -and- | ) |
| H.U.R.B. Landscaping, Inc. | ) |
| Defendant | ) |
| -and- | ) |
| PAT DOES 1-5 | ) |
| Defendants | ) |

**PLAINTIFF'S AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL**

1

Now comes the Plaintiff, T.H. Glennon Co. Inc. (THG) and makes this Amended Complaint as follows:

## I.    PARTIES

1. THG is Massachusetts-based chemical corporation with an interstate presence.  The corporation is owned by its president Mr. Brian Shea.  Headquartered in Salisbury, Massachusetts, THG has production facilities in Pennsylvania and in Salisbury.  THG was founded in 1964, and manufactures and sells water-based adhesives.  More significantly, THG has become involved with green waste recycling and mulch-based colorants.  THG makes and sells both dry and wet mulch colorants, in addition to selling its flagship "Mulch ColorJet," which is a wet mulch coloring system.

2. Defendant Shonn Monday is a natural person with a residence in Ware, Massachusetts.  Mr. Monday was an employee of THG for eight years until he was terminated in June 2018.  Mr. Monday served as a traveling salesman and was charged with running the northeastern territory, covering 12 states.  Mr. Monday is an incorporator of TMG Green LLC

3. Defendant Debra Monday is a natural person with a residence in Ware, Massachusetts.  Ms. Monday runs a cleaning company.  She is an incorporator of TMG Green LLC.

4. Defendant TMG Green LLC is a limited liability company based in Massachusetts.  Its primary place of business is in Ware, Massachusetts, and was formally organized in 2016.  Its website initially went live in April 2016.  However the business conception was three years in the making and was originally conceived by Mr. Monday in 2013.  Ms. Debra Monday is the manager of the company.

5. Defendant Ulderic Boisvert is a natural person with wholesale and retail landscaping goods and materials facilities located in Albany, NY.  Mr. Boisvert is the principal of Greenwood Farms and H.U.R.B. Landscaping, also located in Albany, NY.  He is the owner of a patent for the device known and trademarked as the "ColorCritter."  He has also invented a mulch coloring drum.  Prior to the allegations by THG advanced herein against the Defendants, Mr. Boisvert, Greenwood Farms, LLC, and H.U.R.B. Landscaping, Inc. were customers of THG.

6. Greenwood Farms LLC is a New York limited liability company of which Mr. Boisvert is the principal, with a mulching/landscaping yard in Albany, New York.  It was chartered in 2015.

7. H.U.R.B. Landscaping Inc. is a New York corporation of which Mr. Boisvert is the principal.  It is related to Greenwood Farms and owns or shares assets with Greenwood Farms.  It was chartered in 1995.

8.  Upon information and belief, Pat Does 1 through 5 are individuals and/or corporations whose names and addresses are unknown, and despite the Plaintiff's ongoing investigation have yet to be identified with particularity.

## II.    JURISDICTION AND VENUE

9.  This Court has federal question jurisdiction over the claims arising under federal statutes including the RICO law, CFAA, and the DTSA.  The Court has ancillary jurisdiction over the pendant state law claims.

10. The Court has personal jurisdiction over the Defendants, especially under the RICO law.

11. Venue in Massachusetts is proper.

12. On April 30, 2019, based on the forensic computer analysis conducted by the Plaintiff's IT Experts, the Defendants were provided Notice that Plaintiff had discovered incontrovertible evidence of their ongoing  joint scheme to harm the Plaintiff, in the form of a Certified / Return Receipt demand letter seeking to open negotiations; the letters to Mr. Boisvert were returned "refused," the letter to Debra Monday went unanswered, and Defendant Monday, through his counsel, rejected a proposed resolution.

## III.    FACTS APPLICABLE TO ALL COUNTS

13. Mr. Monday's employment with T.H. Glennon ended on June 28, 2018.  Mr. Monday had refused to return to the company's offices for an interview to review alleged misconduct, so he had been terminated by letter and by email, and subsequently by phone.

14. On his hiring, Mr. Monday signed a "Non-disclosure confidentiality agreement, ("NDA"). The confidentiality agreement expressly delineates classifications of confidential information, trade secrets, and proprietary information.  Mr. Monday was obligated under the NDA to keep the company's information secret.

15. Mr. Monday additionally had a great deal of access to internal documents and information. The corporate database to which he had access had more than 4000 customer contacts and file information.

16. Upon his termination, Mr. Monday's access to the company's internet based confidential customer database was terminated.  Mr. Monday was also directed to return company property to Vice President Rocky Berry.  Plaintiff THG was especially concerned with the return of proprietary data contained within the company laptop, iPad, and phone provided to Mr. Monday.  On July 5, 2018, Mr. Monday returned the three devices to Rocky Berry's home, in person, refusing to set foot on T.H. Glennon's property.

17. Upon its return, the company phone had been wiped clean.  Important and confidential customer contact information, and communications with the company, were erased or destroyed.

3

18. The iPad which Mr. Monday had been assigned was also wiped clean, reverting to an original, reconfiguration status. The iPad had been configured to provide access to T.H. Glennon's proprietary customer database. The iPad contained confidential information including, customer pricing, revenue figures, T.H. Glennon corporate revenue information, corporate sales plans and information, correspondence, photographs of onsite customer locations, in additional to corporate contacts. Mr. Monday's sales position was a traveling one, so all this information was saved locally on the iPad so he could access it, as needed. However iPads are small portable devices which work off of cloud computing to be mobile. He also uploaded information learned in the course of his employment from the iPad to the corporate database.

19. The company laptop, a Lenovo, Mr. Monday returned was also wiped clean. The company laptop was loaded with approximately 100 email contacts, including personal contact information, for both T.H. Glennon and its customers. The laptop also had T.H. Glennon advertising information and sales literature.

20. After discovering that the three devices had been wiped, Ms. Berry contacted Mr. Monday to ask about the company's confidential information. Ms. Berry also inquired about why everything had been data-sanitized and the company's proprietary information had been deleted. Mr. Monday replied that he had linked the company's devices to his personal google email account as well as an iCloud/itunes account. He had removed the linkage, which, he asserted required, or rendered, the devices to their erased status.

21. Ms. Berry asked for access to Mr. Monday's personal accounts so that the proprietary information could be retrieved. Mr. Monday refused.

22. Mr. Monday has defiantly refused all attempts to seek the return of T.H. Glennon's information, including confidential information, proprietary information, intellectual property in the form of copyrighted and trade secret materials, as well as personal information which T.H. Glennon is statutorily required to protect, and customer information which T.H. Glennon is also required to safeguard.

23. Mr. Monday has also deliberately destroyed company material. Concomitantly with erasing the three devices, Mr. Monday erased hundreds of emails from his T.H. Glennon corporate email. A computer expert was able to recover more than 300 deliberately deleted emails from the last year of Mr. Monday's employment. THG has hired computer consultants at substantial cost to retrieve some of the destroyed data from both the wiped devices and from the corporate email account. Thousands of filed were recovered from the Lenovo laptop although frequently only partially readable. The iPad and iPhone files were largely unrecoverable.

24. T.H. Glennon is concerned that Mr. Monday has destroyed, or rendered inaccessible their corporation information. This has hampered their efforts to continue sales in Mr. Monday's former territory by his successor. T.H. Glennon must also safeguard its intellectual property and confidential information from misuse. Such misuse may include competitors

gaining an unfair trade advantage, or breaches of the statutory obligations of privacy and information protection.

25. In a subsequent investigation, T.H. Glennon (THG) learned that Mr. Monday and Ms. Debra Monday chartered TMG Green LLC to run a competing side business while Mr. Monday was employed at THG.  TMG Green has received confidential information, the consumer database, and substantial commercial benefits stolen by Mr. Monday from THG.

### III.    T.H. GLENNON'S ATTEMPTS TO MITIGATE ITS LOSSES

24. In an attempt to retrieve its proprietary data, THG was told by counsel for Defendant Monday that (Monday) had "mirrored" the data on the THG hardware on a portable hard drive in the possession of Monday.

25. Counsel for Mr. Monday provided the said drive, which was analyzed by THG's IT Specialists, Black Swan Digital Forensics, in Memphis, TN ("Black Swan").  During the course of the analysis, Black Swan was able to determine that Mr. Monday is, and during the course of his employment with THG, a principal of TMG Green LLC ("TMG"), a Massachusetts limited liability company. TMG competes against THG in the niche field of green waste recycling and mulch coloring. TMG's website went live in April, 2016, although evidence demonstrates that it has been in the process of developing its business model since 2013.

26. Mr. Monday was subsequently discovered to have misappropriated a multitude of confidential THG files. Among these files was THG's proprietary customer database, a valuable property which IS central to THG's operation. THG's exposure in the aggregate is calculated to be Seventy Seven Million ($77,000,000.00) Dollars in customers and goods shipments. The list was acquired by THG from a European company which shuttered its North American operations. The THG customer list has been nurtured and maintained by Mr. Brian Shea, THG's President, with decades of continual effort and refinement. The said list had been stored in a filemaker database. Mr. Monday was able to access information to which he was not permitted via conventional and requisite computer passwords. Mr. Monday took several copies of the database, learning all of THG's operations, plans, and revenues, company-wide across its entire national operation. Mr. Monday was only granted access to those portions of the database which covered his sales territory comprising 11 northeastern states and Canada. Mr. Monday's efforts at computer hacking apparently became more sophisticated as he originally only took copies of the filemaker files which proved inaccessible without the filemaker program and permissions. Subsequently; Mr. Monday apparently learned (either through trial-and-error, or, with assistance from others) how to better hack the program, converting the raw data from the database into Microsoft Excel files, which are easily readable and portable. Mr. Monday's unauthorized access, in circumventing THG's computer safeguards is a prime act of economic espionage. The subsequent theft, on multiple occasions, of copies of the database is a gross form of trade secret theft.

5

27. Additionally, Mr. Monday has openly diverted THG sales opportunities, by referring customers to TMG Green, a competing business in which he is a principal.

28. Mr. Monday, in the span of approximately two years, converted THG customers to Defendant competitor Ulderic Boisvert's color device and process, instead of selling THG's signature Mulch Colorjet.[1]

29. This conversion enabled Mr. Monday and his associates to poach THG customers. Mr. Monday has also obtained access to, and made off with THG's proprietary formulae for the creation of colorant. Mr. Monday has also conducted testing of THG's products using self-constructed sensors, by subterfuge, for the purpose of conveying the information to THG's competitors, including Defendants Debra Monday and Ulderic Boisvert.

30. Mr. Monday was absolutely dauntless is his industrial espionage. During his term of employment with THG he was actively working on developing a better ColorCritter, the competing dry machine, Defendant Boisvert. Mr. Monday also submitted fraudulent invoices to be reimbursed by THG for business expenses which occurred on behalf of Defendants TMG Green and Boisvert, such as extra tolls for hauling equipment, as well as road expenses for days in which he was actually in the office. Mr. Monday also routinely, during his employment with THG, conducted market research for TMG Green. The utter hubris exhibited by Mr. Monday in receiving a salary from THG while actively working to defeat and undermine it would be remarkable in and of itself, but is just a portion of Mr. Monday's other astonishingly malevolent efforts.

31. In a draft business plan for TMG Green dated February, 2016, Mr. Monday and TMG Green boasted about their financial stability because of the theft of THG's time and money: "Current income from an employer along with an established self-employed business will continue to be maintained for ongoing income." TMG Green Business Plan, p. 4 (February, 2016).

32. Defendant TMG Green is in a partnership with Defendants Boisvert and his two entities: H.U.R.B. Landscaping Inc., and Greenwood Farms LLC. For example the TMG Green business plan, seeking financing from third-parties, stated "The company has recently established a partnership with Greenwood Farms to purchase the patent for the ColorCritter." TMG Green Business Plan, p. 3 (February, 2016). The Patent is numbered US 7,381,271 B2, and was issued on June 3, 2008. That patent was bought, as an assignment, on October 17, 2015. Defendant Boisvert also paid for an extension of the patent until January of 2026. TMG Green makes much of its "exclusive" arrangements with Defendant Boisvert and his entities. TMG Green Business Plan, p. 3 (February, 2016).

33. TMG Green also intends to improve upon the patent. These improvements were designed by Mr. Monday on THG equipment. The research and design work was done by Mr. Monday using THG resources, such as access to industry journals and THG market research on competitors' activities. Mr. Monday communicated with suppliers of plastics

---

[1] THG sells the Mulch Colorjet. The "ColorCritter" is one of the better known competing machines with THG products, *controlled by Defendant Ulderic Boisvert.*

and metals on his THG corporate email. Mr. Monday's research into trommels and fluid dynamics was done on THG computers and sent to himself from his THG email. Mr. Monday used his THG computer to store the files and work through the design issues.

34. More egregiously, the testing of the redesigns were done by Mr. Monday while he claimed to THG personnel to be at customer sites doing sales calls for THG. Mr. Monday subsequently produced videos, photographs and other marketing multimedia for the Defendant Boisvert's ColorCritter while at Mr. Boisvert's yards, using THG equipment.

35. The designs were substantially improved by Mr. Monday's surveillance of THG production facilities and theft of THG formulae, instructions, MSDS, and marketing materials.

36. The connections between Defendants TMG Green and Boisvert are substantial and intricate. Not only did TMG Green shoot its advertising materials at Mr. Boisvert's yards, but TMG Green also regularly provided draft advertising materials to Defendant Boisvert's entity Greenwood Farms. Several drafts of marketing materials boasting the ColorCritter's superior performance, cheap material cost, and durability were found on the aforementioned portable hard-drive Mr. Monday owned, although the files indicate that they were written by Defendant Debra Monday.

37. TMG Green also has a business arrangement for the continued manufacture of the ColorCritter.

38. TMG Green was not shy in boasting about the fruits of its intellectual property theft. TMG Green trumpeted its access to an "established" customer database of more than 2000 contacts. TMG Green Business Plan, p. 3 (February, 2016). This list is the THG customer database that Mr. Monday, after hacking THG's computers, successfully pilfered. Mr. Monday regularly took illicit copies of the database once he figured out how. Now, TMG Green boasts that access to the stolen (THG) trade secrets as part of its strengths and as central to its business strategy.

39. Mr. Monday has engaged in serial acts of sabotage aimed at crippling THG, and obscuring his theft of THG trade secrets and intellectual property. In addition to wiping the THG computer devices, he actively deleted large swaths of emails from his corporate email account. Mr. Monday sabotaged THG sales, with sales of its flagship Mulch Colorjet seeing a 30% drop in his territory, which is THG's home territory and breadbasket. Sales of colorants in Mr. Monday's territory saw a precipitous drop after TMG Green's website went live, covering Mr. Monday's last two and one-half years of employment with THG. THG's other territories all saw growth, of varying strength, through the same period, lending to an inference that Mr. Monday has a studied disinterest in selling THG products to its customers.

40. Mr. Monday worked to undermine customers' confidence in THG. Among other things, Mr. Monday would lie to customers about THG being "unable to ship the requisite color products" or otherwise degrade THG's commercial capacities to its customers. For example, in November, 2017, Mr. Monday told Jeff Moulton (of (THG customer) "Terex")

7

to buy a TMG Green colorant delivery system instead of purchasing THG's unit by lying to Mr. Moulton about what THG was able to sell. In March, 2018 another company seeking colorant was referred to TMG Green rather than sold THG colorant. Mr. Monday also used THG corporate email and the THG phones to make TMG Green sales. Copy for the TMG Green website, written on THG time, was sent to Defendant Debra Monday from the THG corporate email account, shortly before the TMG Green website went live. Mr. Monday researched financial arrangements, such as Northstar Leasing, which is critical to TMG Green's equipment brokerage model, on THG computers, while THG does not finance any of its products for its customers.

41. Mr. Monday began, routinely, forwarding emails containing T.H. Glennon sales reports to his personal email account or that of Defendant Debra Monday ("Manager of TMG Green").   Frequently, these reports were not only his own reports but reports from the entire THG salesforce, covering national and international sales. In addition to numerous other occasions, Mr. Monday did this on June 8, 2018 (May Report and June Report); August 26, 2016 (August report and entire sales volume report history); August 23, 2016 (international sales pricing); January 17, 2017 (entire year's sales reports for entire sales force and projections for following year). Mr. Monday also regularly captured production information, outside his bailiwick as a sales representative, such as on June 5, 2018, when he sent his personal email a copy of the colorant mixture formula for the Mulch Colorjet.

42. Competitor research which Mr. Monday was paid to collect for THG also found its way to TMG Green. THG asks its salespersons, while they are in customer's yards to take pictures of competing machines or product, to remain updated on competitor innovations. Some of the photographs which Mr. Monday took for THG were posted on TMG Green's website, advertising products TMG Green offers for sale. Those pictures, taken by a THG employee on THG time with THG equipment belong to THG under the copyright laws and TMG Green's use of them is theft. Mr. Monday also made off with state-of-the-industry reports owned by THG; all which Mr. Monday simply purloined.  Mr. Monday also stole research that THG did into the extent and scope of sales of colorant and coloring devices.

43. In his effort to improve the ColorCritter, Mr. Monday did a great deal of fluid dynamic research and mechanical/engineering research. This research would not be routine for THG, but it is within the domain of THG to improve its machines and processes based on innovations by competitors. However Mr. Monday did the research on THG company time and with THG company resources, but did not disclose or provide it to THG. The research required extensive amounts of time over many months. THG subsidized it all. However, Mr. Monday made off with the research and used it with Defendants TMG Green and Boisvert to make improvements to the ColorCritter, rather than helping THG enhance its own machines. The research was valuable and extensive. Due to Mr. Monday's destruction of computer files and records, some portions of the research are beyond recovery, but the recovered corporate emails provide the extent of the losses.

44. Mr. Monday, in addition to his job to take pictures of what competitors were doing, did a great deal of mechanical research into how competitor's machines worked, putting the knowledge to use for TMG Green. Examples include researching the Signet 5075 totalizing

monitor (May 13, 2018), the Signet 30250 Diagnostic tool (also May 13, 2018), the Solimar Aerator (May 8, 2018), Apollo equipment (April 21, 2016), "The Beast" color mulching (April 6, 2018), Bandit Industries sales events (April 6, 2018), market research on iron oxide pigments (June 12, 2018), a patent for mulch coloring with screw conveyor (April 2, 2018) part prices for the competing "Color Critter" (May 31, 2016), an unknown competitor's liquid trammel coloring system (March 23, 2016). This research all occurred during the day, when Mr. Monday was on the clock at T.H. Glennon, using T.H. Glennon resources, and then emailing himself the harvested research at his personal email account. This research culminated in Mr. Monday learning how to build a competing system, while on T.H. Glennon company time and devices, such as the pictures taken on May 6, 2018, of Solimar's silo fluidizer, or the time and resources spent researching Spears Manufacturing's PVC pipes and pipe joints on June 5, 2018. Ultimately this research generated a series of engineering plans and designs upon which the new and improved ColorCritter is based, but the files were based on THG research, using THG resources, yet never shared with THG.

45. Despite his multiple distractions with Defendants Debra Monday, TMG Green, Boisvert, H.U.R.B. Landscaping Inc., and Greenwood Farms, LLC, Mr. Monday did not pass up any opportunities to sabotage the THG sales efforts. He was regularly reprimanded for failing to log sales contacts, for not replying to customers, for exceeding sales parameters, and for entering wrong information into the customer database. Mr. Monday routinely failed to start his THG day at 8:00 a.m. as required, with it later becoming apparent that his time was instead devoted to TMG Green business endeavors. Mr. Monday also manually entered deliberately wrong information into the customer base.

46. Mr. Monday cleaned out copies of most other THG-important files: its customer database, financial records, chemical formulae, sales reports, marketing plans, advertising materials, competitor research, photos of customer sites, order records, shipping records, and other materials. He not only misappropriated such materials from his company-issued laptop and tablet, but he also sought out information on the THG servers and computers during his time in the THG offices. He sent or forwarded dozens of emails from his corporate email account to his personal one, or to Defendant Debra Monday, manager of Defendant TMG Green. As aforesaid, when terminated, and in effort to keep his malignant activities secret from THG, he returned the THG computer equipment completely "wiped clean" of data.

47. Mr. Monday and TMG Green have also been in contact with several of THG's competitors. He has sought funding and resources from them, promising THG's proprietary data as a basis for TMG Green's claims to gaining a significant competitive edge. Not only has he solicited THG customers, seeking to woo them away in violation of his noncompete/nonsolicitation agreement, but he has attempted to shop around the misappropriated THG files.

48. Collectively, the Defendants have profited off the back of THG. To do so, they have stolen files, misappropriated trade secrets, conducted industrial espionage, diverted corporate opportunities, sabotaged THG sales efforts, violated THG's intellectual property rights, and generally taken patently unfair advantage of THG.

49. The named Defendants, and those not known at this time, (Pat Does 1-5) will continue to profit handsomely from the materials stolen by Mr. Monday. They have regularly communicated and taken several overt steps together, such as testing, creating promotional material, incorporating research into the new ColorCritter, establishing formal legal relationships and contracts. Videos depicting the use of the improved ColorCritter were taken in Mr. Boisvert's yard, using his equipment, and with his knowledge and cooperation.

50. TMG Green continues to solicit third-party funding, and advertises the THG-stolen customer database as its own. TMG Green has created advertising material for Greenwood Farm's new mulch color drum, which conveniently may be connected to the ColorCritter for operation. The promotional material suggests that that the drum may be obtained by contacting either Greenwood Farms or through TMG Green 's website.

51. These acts, including those taken together and the public acknowledgments of a legal relationship by and between them, are a sufficient factual basis to prove a RICO conspiracy.  The predicate acts for a pattern of racketeering activity need only include two prohibited acts within 10 years. Violations of 18 U.S.C. 51832 (theft of trade secrets) is now a predicate RICO act under S3(b) of the DTSA. Mr. Monday has, and TMG Green and Mr. Boisvert share in, several violations of 1832. The sections prohibits:
Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly⎯

(1)      steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

(2)      without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;

(3)      receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(4)      attempts to commit any offense described in paragraphs (1) through (3); or

(5)      conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to affect the object of the conspiracy, 18 U.S.C. s. 1832.

52. There is no doubt that Mr. Monday misappropriated THG materials. While he was authorized to access some of them, he hacked his way into accessing the full THG customer list database. That customer list is a trade secret, the most valuable asset THG owns. Mr. Monday also destroyed THG computer files and wiped clean THG devices to attempt to cover-up his theft. He also attempted to delete scores of emails from the corporate email account he was assigned, though they were recovered. He routinely emailed away THG

10

files and materials (constituting trade secrets) to his personal email accounts and that of Defendant Debra Monday.

53. Defendants Shonn Monday, Debra Monday, TMG Green, Boisvert, Greenwood Farms, LLC and H.U.R. B. Landscaping, Inc. have all conspired to obtain THG's information and research, knowing it to be stolen. TMG Green has openly advertised, to potential funding sources, its possession of an "established" customer list even before TMG Green was established as an entity. Mr. Boisvert regularly hosted Mr. Monday, while supposedly on THG sales calls, for testing and filming the adaptation of THG research to the new iterations of the Mulch Drum and the ColorCritter.

## COUNT I—BREACH OF CONTRACT
### (As Against Defendant Shonn Monday)

54. Incorporating and repeating all factual assertions above, THG pleads against Defendant Shonn Monday, Breach of Contract.

55. Mr. Monday signed a nondisclosure agreement (NDA) on his first day of work at THG as a prerequisite to his employment. That agreement was signed by him on September 16, 2009. He signed it before THG's treasurer Helen Breen who served as witness to both Mr. Monday's signature and Mr. Shea's signature. The NDA was a standard form which THG purchased from "LawDepot."

56. The NDA has several interlocking clauses. The agreement requires nondisclosure, in addition to requiring the return of company property and information at the end of employment. It contains a nonsolicitation provision. It also has a noncompetition provision, applicable both during employment and for two years afterward.

57. Contrary to his promises in the NDA, Mr. Monday failed to return THG files and information to it when his employment ended on June 28, 2018. In fact Mr. Monday kept copies of hundreds of confidential and proprietary files, including trade secrets. To hide his actions, Mr. Monday wiped clean the three THG computers he was issued to do his job, names: an iPad, an iPhone, and a Lenovo Laptop.

58. In violation of the NDA, Mr. Monday was in active and direct competition with THG through his side business TMG Green. He lured away customers. He converted business opportunities away from THG. For example on November 2, 2017, Mr. Monday convinced a THG customer (Mr. Moulton of Terex) to use TMG Green to buy mulch coloring products, in part by lying about THG's commercial capacity. As another example, on March 26, 2018, Mr. Monday told a THG customer who wrote a query about THG coloring products, Mr. Monday told the customer to use TMG Green instead.

59. Mr. Monday has solicited dozens of THG customers, contrary to the NDA's non-solicitation provision, which is not coextensive with the non-competition provision. Mr. Monday has lured away THG customers where possible and poisoned THG's relationships where he could not.

11

60. Mr. Monday breached the NDA with THG by his efforts to destroy, damage or convert THG's business and customers, and THG has suffered damages as a result.

## COUNT II—VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### (Applicable to all Defendants)

61. Incorporating and repeating all factual assertions above, THG states a claim for violation of the Computer Fraud and Abuse Act against all Defendants.

62. THG maintains proprietary customer database which is a closely guarded trade secret. Currently the database has more than 4000 entries for its individual customers. The database is managed through Apple's Filemaker program.

63. The customer database began as a list acquired by THG from a European company which was shuttering its North American operations. The database is maintained on a day-to-day basis by THG's sales force. The database represents the heart of THG's business. It contains everything needed to run a multi-million dollar international green waste recycling business.

64. The database is run on Apple's Filemaker database management program. Normally the data is encrypted in a format which not readable outside of the database. The database is updated on a server kept at THG headquarters. The THG salesforce keeps records of their doings, their interactions with customers, notes for the production units, and customer preferences on the Filemaker database at the company headquarters. This lets the entire company remain up-to-date on their customer needs from sales, to production, through shipment, delivery, and billing.

65. It does involve the salesforce not keeping local records. In fact Mr. Monday was reprimanded several times during his employment for failing to update Filemaker with his efforts, or for entering incorrect information.

66. The database management program also lets the administrator set permissions. For example, THG's permissions were set so that a salesperson such as Mr. Monday would not be able to access or modify entries for customers outside of their sales territory. Only a handful of people have access to the entire database and Mr. Monday was not one of them. There are also controls upon the ability to export the information from the database.

67. Apparently, Mr. Monday has spent years trying to hack into the database. In files turned over to THG in discovery, it became evident that Mr. Monday has extensively copied the database.

68. Mr. Monday was able to learn how to export the information from Filemaker into a Microsoft Excel file. This is a function of Filemaker, but it can be restricted and was. Microsoft Excel files are very portable and easily readable, being one of the standard computer formats going back decades into the 1980's.

12

69. Mr. Monday was then able to take copies of the entire database in the Excel format, which can be read on most computers.  According to a 2017 survey 83% of businesses use some version of the Microsoft Office suite of programs.

70. Mr. Monday also took the database in slices by year.  The database is constantly updated by adding customer preferences, customer plans for the future, customer sales and ordering information.  This data can be overwritten for long-term and repeat customers.  Mr. Monday has taken slices of the database representing the entire database as it was in 2012, 2013, 2014, 2016, 2017, and 2018.

71. Mr. Monday gained unauthorized access to portions of the database he was not allowed to view, including those entries for areas outside of his sales territory.  Mr. Monday subsequently was able to hack around the database permissions to access and take copies of the entire database.  Later he was able, without permission and contrary to his instructions, export the entire database into a Microsoft Excel format.  He made several unauthorized copies and spirited them away.

72. THG calculates the loss of security of its database to an exposure representing Seventy Seven Million ($77,000,000.00) Dollars.

73. In addition to the database, Mr. Monday also took personal copies of all kinds of electronic company files.  Mr. Monday took revenue reports, chemical formulae, MSDS, ordering and billing information, advertising and marketing material, research into competitors, photographs, and much more.  Many of these copies were on his portable hard drive.

74. When Mr. Monday was unable to take electronic copies of information on THG servers that he was not authorized to have access to, he took screen shot copies of information.  Referred to by one of THG's experts as the analog loophole, Mr. Monday was able to take pictures of information displayed on THG computer screens when a terminal in the company's office was logged in under some else's credentials because Mr. Monday did not have authorization.

75. Mr. Monday spirited away other electronic copies by emailing them from his corporate email account to Defendants Debra Monday, TMG Green, Boisvert, and the Boisvert-controlled entities, and / or to Mr. Monday's personal email.

76. When Mr. Monday was terminated, he delayed returning THG's electronic devices (the iPad, iPhone, and Lenovo laptop) by more than a week.  He did not finally return them until July 5, 2018.

77. When the devices were returned, Mr. Monday wiped them clean.  The iPad and iPhone were reset to factory settings and information from then was deemed unrecoverable by the experts THG employed.

13

78. The Lenovo laptop was also wiped clean.  Some files were recoverable by a computer forensics firm hired by THG.  However there were thousands of files which were "carved." They were only partially recoverable, frequently corrupted and rendered unreadable by the destruction.  For the thousands that THG did recover there are thousands which were not recovered.

79. Additionally, there are approximately a dozen and a half files which THG no longer has native digital access to because Mr. Monday deleted the only electronic files leaving THG with only paper copies.

80. Mr. Monday even submitted a reimbursement request and receipt for the buying of CCleaner Professional. The CCleaner Professional program, among other things boasts that it excels at deleting and destroying files to protect privacy.

81. The actions of the Defendants were deliberate, willful, malicious, and unauthorized.

82. Mr. Monday proceed to delete hundreds of emails from his THG corporate email account. Mr. Monday was apparently unaware that the THG IT setup which loads his Filemaker entries in to the remote database on the THG server also backed-up his emails on the THG server.  THG's IT consultant was able to recover more than 300 emails.  It is uncertain how many more were not recoverable.

83. The automatic backups which are default on the iPad and iPhone have been converted. Despite being provided with a company purchased AppleID (which is necessary to use devices Apple makes) Mr. Monday opted to connect both the iPad and iPhone to his personal AppleID.  Apple automatically backs up their devices to cloud-based storage they provide, a design feature which lets the computer devices be smaller and more portable for not having to carry around large hard drives.  Mr. Monday has refused to turn over the backed-up files.  Whatever files still exist are now accessible only to Mr. Monday, behind Apple's security and they are lost to THG unless Defendants provide them.

84. The Computer Fraud and Abuse Act is currently codified at 18 U.S.C. §1030.  The Act allows for the institution of a private action for violations which implicate factors of harm. §1030(g) ("Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.")   In particular Mr. Monday has violated §1030(a)(2)(C); §1030(a)(4); §1030(a)(5)(A)-(C).

85. In addition to the disruption of it business activities, THG has incurred real damages and expenses trying to undo Mr. Monday's and his co-defendants' acts of computer theft and destruction of records.  THG has had three computer firms provide it services relating to Defendants' actions.  THG is trying to recover that which is recoverable.  THG is still trying to access those files which Defendants have secreted away.

86. The Defendants are joined in these wrongful actions:  TMG Green has sought commercial corporate financing using the THG customer database as proof of its capacity.  TMG Green

14

and Mr. Boisvert's entities have entered into exclusive partnership.  They have solicited customers using information from the stolen database and files.

87. As a result of the Defendants' violations of the Computer Fraud and Abuse Act, the Plaintiff T.H. Glennon Company, Inc. has suffered damages.

## COUNT III-INTERSTATE MISAPPROPRIATION OF TRADE SECRETS
### (Applicable to all Defendants)

88. All prior factual allegations are herein repeated.

89. The Defendants' actions violated the Federal Trade Secret Protection Act (18 U.S.C. §1831, et seq).  T.H. Glennon is entitled to relief under 18 U.S.C.§1835 (orders to preserve confidentiality) and §1836 (private proceedings to protect trade secrets).

90. The requisite element of interstate commerce is met by the interstate sales conducted by Mr. Monday.  It is also met by the interstate production conducted by T. H. Glennon, between its manufacturing facility in Pennsylvania and its business offices in Massachusettts.

91. Much of the information erased, and kept, by the Defendants meets the definition of "trade secrets" within the federal law.

92. T.H. Glennon has already lost access to information of incalculable value.  It has also invested a great deal of resources to keep and protect its intellectual property.  Estimates of the value of the exposure of loss amount to approximately Seventy Seven Million ($77,000,000.00) Dollars.

93. The theft of the customer database is a threat to the existence of THG.  The customer database has more than 4000 contacts.  It contains notes from THG's sales teams continually updated on customer preferences.  It contains historical and current financial information.

94. Mr. Monday has also stolen formulae from THG and disseminated it to the herein named and unnamed co-defendants.

95. On his initiative, while working at THG, Mr. Monday worked to improve Defendant Boisvert's competing ColorCritter.  The research involved fluid dynamics, metals, how trommels work, the state of market demand, and understanding competitor devices.  The research was extensive.  It was done on THG time, using THG resources, by Mr. Monday (while a THG employee).  That information was subsequently stolen by Mr. Monday and provided to the named and unnamed co-defendants.

96. Defendants TMG Green and Boisvert are in an exclusive partnership.  They work together sharing corporate plans.  They write marketing plans and share advertising copy.  Mr. Monday, Debra Monday, and TMG Green have also shared the research with one of Mr.

15

Boisvert's entities, which is now marketing a new color drum which works primarily with the ColorCritter.

97. As part of the exclusive partnership between the Defendants, Bosivert bought the ColorCritter patent and trademarked a new design. The improvements upon which the Defendants rely are based on THG research and trade secrets.

98. TMG Green has shopped its possession of THG materials around to other entities, including in the pursuit of corporate financing.

99. As a result of the wrongful actions of the Defendants, THG has suffered great damages.

## COUNT IV—R.I.C.O. CONSPIRACY
### (Applicable to all Defendants)

100. All factual allegations are repeated herein

101. The RICO law was amended in 2016 by the Defending Trade Secrets Act to make misappropriation of trade secrets a predicate act under the RICO statute. Pub. L. No. 114-153, §3(b), 130 Stat. 376, 382 (2016) (amending 18 U.S.C. §1961). Mail fraud and wire fraud are also predicate acts.

102. Mr. Monday has, for his benefit, as well as the benefit of the named and unnamed co-defendants, undertaken a years-long campaign of industrial espionage.

103. Mr. Monday started working for THG in 2009. On his first day he signed an NDA to protect confidential company information and trade secrets.

104. According to his resume, Mr. Monday was working to create his own competing business as early as 2013.

105. In 2015, Mr. Monday and Ms. Debra Monday chartered TMG Green LLC. This business competes with THG in the niche field of green waste recycling.

106. Mr. Monday managed to hack into the THG customer database, despite computer safeguards designed to prevent his access, to take whole copies of the database. Mr. Monday's early hacking efforts were quite primitive, but he later learned how to export the database into a Microsoft Excel format.

107. The customer database is the crown jewel of THG's business and is a closely guarded trade secret. The list was acquired by THG from a European company which shuttered its operations. It has been extensively maintained and updated.

108. Mr. Monday has also stolen thousands of files from THG. These files include chemical formulae, MSDS, financial records, customer ordering information, research into

16

competitor methods and devices, sales information, business plans for marketing, and other information which are protected trade secrets.

109. Mr. Monday has deliberately deleted hundreds of thousands of files across the THG devices and from his corporate email in an attempt to cover his tracks.

110. Mr. Monday regularly sent emails from his corporate email to Ms. Monday, his personal email for TMG Green, and other co-defendants named and unnamed, to make use of the THG resources.

111. Mr. Monday misappropriated research into competitor designs by THG.

112. Mr. Monday also did extensive research into mixing color and improving the mixtures, including information into trommels, metals, fluid dynamics, and competing devices.  Mr. Monday did this research for THG, on its time using its devices.  Ultimately, Mr. Monday did not provide any of his discoveries or efforts to THG, instead appropriating them for TMG Green and for the benefit of the other named and unnamed co-defendants.

113. Mr. Monday has stolen research on an extensive basis, covering not only the work he did, but industry trade reports that he ordered in THG's name but did not provide.

114. Mr. Monday has stolen chemical formulae.  He spent consideerable time researching and assembling chemical sensors.  It appears the chemical sensors were designed to allow Mr. Monday to reverse engineer those processes he was not able to gain access to from THG.

115. On several occasions Mr. Monday diverted corporate opportunities which came to his as a THG salesman and sent them to TMG Green, a business in which he personally is a principal.  One example is from November 2017, when he sent Jeff Moulton to by a TMG Green machine instead of buying from THG.  In March 2018, another company was referred by Mr. Monday to TMG Green instead of THG to buy colorant, which TMG Green now claims not to sell.

116. Mr. Monday sabotaged THG by entering deliberately erroneous information into its database, or sometimes not entering information at all, causing damage to the reputation of THG's smooth production and delivery operations.

117. Mr. Monday solicited THG customers for TMG Green and his co-defendants named and unnamed; all in violation of the NDA.

118. Mr. Monday lied to THG customers about the availability and capacity of its flagship Mulch Colorjet.

119. Mr. Monday ceased enthusiastic efforts as a salesman for THG.   His home territory is the breadbasket for THG.  However it saw a 30% drop in sales of the Mulch Colorjet during the last three years of his employment.  Clearly Mr. Monday was no longer interested in selling THG's product which competed with TMG Green's ColorCritter.  Sales of colorant

in Mr. Monday's territory saw a sharp drop, compared with other territories which saw substantial growth.

120. Mr. Monday felt free to deliberately pick fights with large THG customers, alienating them from THG, by being difficult and obstreperous. One several occasions he alienated customers by acting contrary to explicit instructions to not sell them anything aside from their customary order, since they would not be receptive to such aggressive salesmanship. Mr. Monday disobeyed the express instruction, on purpose, and alienated the customers.

121. Mr. Monday converted much of the THG customers in his sales territory from wet colorant (processed by the Mulch Colorjet) to dry colorant, for which THG makes the raw materials but not the processing machine. The ColorCritter sold by TMG Green and Boisvert however uses dry colorant. Mr. Monday's efforts appear to have deliberately made it easier for his business partners to poach THG customers

122. Mr. Monday submitted to THG for reimbursement fraudulent invoices for costs incurred for Boisvert and TMG Green, such as extra tolls for hauling equipment or road expenses for days he reported that he was in the office.

123. Mr. Monday and TMG Green have boasted about their ability to bilk THG through Mr. Monday's paycheck while continuing to work the side business, as sign of financial stability of TMG Green.

124. Mr. Monday's extensive mechanical and fluid research culminated in engineering diagrams for a new and improved dry mixing machine. The engineering diagrams were designed on the THG computer during THG time, by Mr. Monday (then a THG employee). However they were instead given to Boisvert and TMG Green, rather than offering THG the fruits of the labor they paid for.

125. Mr. Monday's destruction of computer files have rendered large swaths of the research THG paid for inaccessible to them.

126. Boisvert bought the patent on the ColorCritter and is now, with TMG Green, selling non-patented new and improved versions of the ColorCritter, based on Mr. Monday's research and engineering designs.

127. Boisvert's entities have also designed a new coloring drum, a feeding device which loads material into a processing machine like the ColorCritter. It appears the new color drum was designed with reference to Mr. Monday's engineering designs.

128. Ms. Monday (manager of TMG Green) wrote advertising copy and a marketing plan for Bosivert's new coloring drum.

129. The new designs were tested on Boisvert's mulching yard.

18

130. Videos for TMG Green, and photographs, were taken on Boisvert's property, apparently while THG was paying Mr. Monday to be on sales calls for it.

131. Ms. Monday for TMG Green wrote advertising material for the ColorCritter boasting superior performance, cheap material cost, and durability. It appears these assertions were based on tests conducted by Mr. Monday in Boisvert's yard.

132. TMG Green boasts of having access to an "established" client database containing thousands of contacts. This is the stolen THG customer database.

133. Mr. Monday routinely sent Ms. Monday information from his corporate email account including THG financial information, customer ordering information, and reports of sales efforts by the THG sales team nationwide.

134. Competitor research that Mr. Monday was paid by THG to collect also found its way to TMG Green. Frequently in the form of pictures taken by sales staff when they visit customer sites, this research keeps THG informed of what colors its competitors are selling, how they look, and how they are packaged and sold.

135. Mr. Monday has refused to return thousands of pictures he took for THG during his employ. They are currently stored in an automatic Apple backup which only Mr. Monday has the ability to access.

136. TMG Green and Boisvert have profited off of the back of THG. To do so, they have stolen files, misappropriated trade secrets, conducted industrial espionage, diverted corporate opportunities, sabotages THG sales efforts, violated THG's intellectual property rights, and generally taken unfair advantage.

137. All such activities were coordinated by the named and unnamed defendants collectively, in wholly wrongful attempts to destroy THG.

138. Section 3(b) of the Defending Trade Secrets Act makes the misappropriation of trade secrets a predicate act for RICO. There is no doubt that the named and unnamed defendants have engaged in RICO violations. Evidence clearly shows that the defendants, named and unnamed were the beneficial recipients of Defendant Shonn Monday's actions and aided, assisted, and conspired with him, all to the great damages and injuries as sustained by THG.

## COUNT V—MISAPPROPRIATION; G. L. c. 93 §§ 42, 42A
### (Applicable to all Defendants)

139. All prior factual allegations are hereby repeated and incorporated.

140. Mr. Monday has stolen protected trade secrets from T.H. Glennon. This information is essential to the operation of T.H. Glennon's sales operation in 12 states. Without this information, T.H. Glennon loses a material competitive advantage it has built up over years of struggle with significant financial investment.

19

141. Due to the actions of the Defendants, THG is hampered in continuing relations with its customers, and its attempts to continue innovating and providing products for its clients.

142. Mr. Monday has also misappropriated privileged communications from THG clients, which may include outstanding orders or obligations which T.H. Glennon is required to fulfill, but may not actually be aware of.

143. Mr. Monday had access to, and continues to have electronic access to, sales information, marketing strategies, production information, client files, contact information, and other confidential and proprietary information, which he has disseminated to the named and unnamed co-defendants.

144. Mr. Monday has destroyed T.H. Glennon's access to its own information on its own devices. He has refused all attempts to voluntarily provide access to the THG-proprietary information.

145. Mr. Monday has also refused to provide any written or verbal assurance that the confidential information and trade secrets remain secret.

146. The Court is authorized to protect T.H. Glennon's interests under G. L. c. 93 and under the common law.

147. As a result of the actions of the named and unnamed defendants, THG has been injured and damaged.

## COUNT VII—COMMON LAW UNFAIR COMPETITION
### (Applicable to all Defendants)

148. All prior factual averments are herein repeated.

149. As against all Defendants, the Plaintiff pleads a claim for common law unfair competition.

150. THG has been in business since its founding in 1964. It was originally a chemical company specializing in water-based adhesives, although when it was purchased by current owner Brian Shea it added a new line of business in green recycling and mulch coloring.

151. TMG Green was founded in 2015 by Mr. Monday. Mr. Monday, in founding his business opted to adopt a name similar to THG. His logo accentuates the similarity.

152. THG's trade name is a substantial monetary asset. It has been jealously guarded. As good will, the intellectual property is invaluable. In 2007, years before Mr. Monday was employed by THG and long before Mr. Monday went into business for himself, THG paid a graphic designer to design a colored and non-colored logo.

153. The logo consists of the name T.H. Glennon Co. intersecting with a circle. The capital letters "T" and "H" are inside of the circle. The circumference of the circle is a series of small arrows. The circle intersects with an extra-large capital "G" forming the start of "Glennon." The intersection occurs at the 3:00 o'clock position. The logo is designed to be evocative of recycling and environmentally sound practices.

154. TMG Green has adopted a logo clearly intended to be reminiscent of, and to cause consumer confusion with, THG. TMG Green's logo is a circle of colored arrows with a capital "T" in the middle, while bisecting the "M" in the 3:00 o'clock position. This leaves the first large "G" of TMG Green immediately next to the circle. The rest of "Green" is written in much smaller letters underneath.

155. TMG Green has put its website up, taken it down, put it back up, and altered it several times during the last 18 months. During several iterations, TMG Green displayed pictures to which THG owns the copyright. The pictures were taken by Mr. Monday when he was a THG employee on THG equipment (the iPad and iPhone). Some of the photos are from THG customer sites.

156. TMG Green is providing goods and services in the same class of business as THG. Mr. Monday features prominently into TMG Green advertising, having previously been one of the regular faces of THG.

157. The use of THG photos, the choice of a similar name in the same business and the deliberate design of a logo similar to THG's constitute common law unfair competition. In addition to trying to create consumer confusion within the ambit of a passing off action, the Defendants named, and unnamed are diluting the value of THG's reputation and trademark.

158. THG's long and repeated use of its name, buffeted by its adoption of a logo intended to invoke recycling and environmental consciousness, have created a secondary meaning in THG's trade name and its logo.

159. As a result of the actions of the Defendants, THG has been injured and damaged.

### COUNT VIII—COPYRIGHT VIOLATION
### (Applicable to all Defendants)

160. All factual allegations are repeated herein.

161. The Defendants have violated THG's common law copyright.

162. As part of his job, Mr. Monday routinely took photographs of customer sites and competitor goods on the THG iPhone and THG iPad.

163. Mr. Monday has now used photographs belonging to THG to advertise TMG Green's products and services.

21

164. Mr. Monday also frequently emailed THG advertising copy from his THG corporate email to his personal email and to Ms. Monday's email and disseminated protected, THG copyrighted material to the co-defendants, named and unnamed.  Although the website has been altered several times, on at least one occasion, TMG Green used marketing copy from THG.

165. As a result of the actions of the defendants named, and unnamed, THG has been injured and damaged.

### Count IX—UNFAIR AND DECEPTIVE TRADE PRACTICES: G.L. c. 93A
### (Applicable to all Defendants)

166. The above contained factual allegations are herein repeated.

167. The Defendants, engaged in trade and/or commerce, having utilized stolen THG-proprietary materials and information, are engaged in unfair and deceptive trade practices.

168. Through a concerted campaign of industrial espionage, over several years, Mr. Monday and his co-defendants, both named and unnamed, spied on the commercial activities of THG, making use of THG resources for their benefit.

169. Defendant Shonn Monday was a disloyal employee who diverted corporate opportunities from THG to himself and his co-defendants.

170. Defendant Shonn Monday absconded with trade secrets worth millions of dollars, especially THG's customer database.  He also appropriated THG's chemical formulae and financial information.

171. Defendant Shonn Monday obtained the customer list and other files by hacking through safeguards on THG technology, which otherwise limited him to information regarding his sales territory.  Mr. Monday, in concert with his co-defendants, has used the stolen customer database to solicit customers in violation of his NDA.

172. Mr. Monday deliberately destroyed thousands of files across several devices and his corporate email account to attempt to hide his actions.

173. Mr. Monday signed an NDA, apparently with no intention of honoring any of the terms. He broke the while-employed competition clause, the post-employment competition clause, the non-solicitation clause, the return of confidential information clause, and the non-disclosure clause.

174. Mr. Monday sent dozens of emails, containing THG files and information, from his corporate email to his personal email, to Ms. Monday's computer, and to the other named defendants.

175. Mr. Monday has taken photographs belonging to THG. He has used some of them for marketing for benefit of the Defendants' joint enterprise.

176. Mr. Monday spent hundreds of hours on THG timeclock, researching improvements to the Defendants' ColorCritter. He researched fluid dynamics, metals, plastics, tubing, and competitors such as "Bandit." Mr. Monday also created chemical sensors to reverse engineer those formulae. When the research culminated in engineering designs, Mr. Monday approached his co-defendants for a commercial collaboration. Defendant Boisvert purchased the ColorCritter patent and trademarked a logo. The Defendants are now selling non-patented improved ColorCritters mark II and mark III based on the research Mr. Monday did using THG's industry resources and time.

177. Mr. Monday still retains exclusive control and access to hundreds of photographs from the THG iPhone and iPad. With both devices wiped clean, the only extant copies of the files are in the automatic Apple iCloud back-ups. Those are available only to Mr. Monday and he has refused to return them or grant access to them.

178. As a result of the actions of the Defendants, THG has been injured and damaged.

### COUNT X—TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP
### (Applicable to all Defendants)

179. All prior factual assertions are repeated herein

180. As against all Defendants, the Plaintiff pleads a claim for tortious interference with a contractual relationship.

181. Defendant Shonn Monday was an employee for THG, hired in 2009. On his first day, September 16, 2009 as a condition of employment, he signed a non-disclosure agreement (NDA).

182. TMG Green knew of Mr. Monday's employment relationship with THG. TMG Green was also aware of Mr. Monday's contractual obligations under his NDA to not compete, during or after employment, to not solicit, to not disclose, and to return company information.

183. After involving himself with TMG Green, Mr. Monday stole THG trade secrets. He also hacked into and stole the THG customer database. Mr. Monday solicited THG customers for TMG Green. Mr. Monday also lied to THG clients about THG commercial capacity and at least twice actually diverted THG customers seeking its products to TMG Green.

184. TMG Green and the other named Defendants also interfered with THG's relationships with its customers.

185. Defendant Boisvert and his entities were customers of THG, but since TMG Green has intervened, Boisvert and his entities have ceased all relationship with THG.

23

186. Several other customers of THG have been solicited by Mr. Monday and TMG Green and have stopped ordering from THG.

187. Even when TMG Green could not lure THG customers away, TMG Green has derided THG. TMG Green competes against THG, but not in all of THG's lines of business. TMG Green has not limited it approach of THG customers to those whom it could service and has not restricted its attempts to denigrate and disparage THG to its customers in TMG Green's own line of business. This unrestricted abuse of THG, by TMG Green, is clearly malicious.

188. TMG Green, in concert with the other named defendants, has acted against THG out of malice. The Defendants have deliberately attempted to undermine THG's customer base, using trade secrets stolen from THG by Defendant Shonn Monday.

**COUNT XI—DIVERSION / USURPATION OF CORPORATE OPPORTUNITY**
**(Applicable to all Defendants)**

189. All prior factual allegations are included herein.

190. The Plaintiff claims diversion and usurpation of corporate opportunity as against all defendants, who together, wrongfully appropriated THG's corporate opportunities.

191. Mr. Monday was employed for eight and half years as a salesman for THG. He was charged with the home territory, covering 11 northeastern states. Mr. Monday owed a duty of loyalty to THG.

192. Mr. Monday additionally agreed in an NDA: 1) not undertake any conflicts of interests, 2) that any business opportunities related to THG's lines of business belonged to THG, 3) that all such opportunities must be reported to THG in writing, 4) not to undertake, directly or indirectly, to pursue any opportunity without the written consent of THG, 5) not to compete or plan to compete, solely or with others, against THG without its written consent.

193. Mr. Monday has routinely violated these stated and aforesaid obligations.

194. In November 2017, Mr. Monday referred a customer seeking products from THG to TMG Green, falsely claiming that THG could not address the client's need.

195. In March 2018, Mr. Monday repeated these actions with another prospective customer.

196. Mr. Monday used extensive THG resources to develop and plan an enterprise to obtain the competing ColorCritter, improve it, and then compete with THG. Mr. Monday's years of research culminated in engineering designs to improve the ColorCritter.

197. Mr. Monday did not approach THG to undertake the opportunity, nor offer it recompense for its time and resources. Mr. Monday, contrary to his obligations, did not seek to obtain THG permission.

198. Mr. Monday instead took the research to his co-defendants to compete with THG. The collaboration has resulted in a new and improved version of the ColorCritter which competes directly with THG's flagship Mulch Colorjet.

199. Mr. Monday has on several other occasions diverted and usurped corporate opportunities to and for the benefit of his co-defendants.

200. The defendants made extensive use of THG's assets. Mr. Monday submitted fraudulent expense reports and received reimbursement for expenses that were incurred on behalf of the co-defendants.

201. The breach of the duty of loyalty, and contractual obligations, is particularly egregious because several diverted opportunities of which THG was never made aware, and thus could not exploit, were presented to Mr. Monday in the capacity in which he was employed by THG.

202. Mr. Monday also contracted in the NDA that ideas or opportunities developed by him, particularly using THG resources, could not be used to compete against THG without his consent.

203. As a result of the diverted and usurped corporate opportunities by the Defendants, the Plaintiff T.H. Glennon Company, Inc. has been injured and has suffered great damages.

## CLAIMS FOR RELIEF

**WHEREFORE**, The Plaintiff, T.H. Glennon Company, Inc. requests that this Honorable Court GRANT judgment in its favor, and award the Plaintiff the following against ALL Defendants:

1. Compensatory Damages;

2. Punitive Damages;

3. Double or treble damages, attorney costs and fees;

4. All applicable statutory damages;

5. In the alternative to punitive damages, punitive assignment of royalties under the DTSA should the Court be unable to unwind the damage done by the effect of the stolen intellectual property's incorporation into a new device;

6.      All applicable injunctive and equitable relief, including for the extraordinary equitable remedies under the RICO to ensure that wrong-doers do not escape liability through the benefit of other entities or persons;

7.      The appointment of a court-supervised receiver under both the DTSA and RICO, to supervise the affected entities and isolate and obtain the security breaches of the stolen trade secrets contained on computers and storage entities to which the Defendants have or had access.

8.      Whatever further relief this Court deems just.

Plaintiff demands a jury trial on all counts so triable.

T.H. Glennon Company, Inc.
By its attorney,

*Bradford Eliot Keene, Esquire*

Dated: June 5, 2019

Bradford Eliot Keene, Esquire
Law Offices of Bradford Eliot Keene, P.C.
7 Kimball Lane, Suite B
Lynnfield, MA 01940
Phone: (781) 246-4545
Fax: (781) 246-3999
bkmogul@aol.com